UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __3/28/2025__

LOANCARE, LLC,

                            Plaintiff,

            -against-

DIMONT & ASSOCIATES, LLC and INVESTOR
CLAIM SOLUTIONS, LLC,

                            Defendants.

22-CV-09286 (MMG)

**<u>OPINION & ORDER</u>**

MARGARET M. GARNETT, United States District Judge:

            This case concerns the processing of reimbursement claims for costs associated with

defaults on federally backed mortgages.  Plaintiff LoanCare, LLC ("LoanCare") is a loan

subservicer, which means it services loans for investors that own the servicing rights to the

underlying mortgage loans.  In 2018, LoanCare contracted with Defendant Dimont & Associates,

LLC ("Dimont") to perform certain services relating to subservicing, including the preparation,

submission, and review of investor claims for reimbursement from federal agencies.  Dimont

performed these services for LoanCare until March 2022, when LoanCare terminated the

relationship due to alleged ongoing deficiencies associated with Dimont's performance.  Shortly

after LoanCare terminated the Dimont relationship, Dimont's investor claims division was

acquired by Defendant Investor Claims Solutions, LLC ("ICS").  In this action, LoanCare seeks

to recover damages from Dimont (and also from ICS on a successor-in-interest theory) for

breach of contract for Dimont's alleged failure to indemnify LoanCare and for its failure to

perform its contractual obligations.  *See* Dkt. No. 25 (the "Complaint" or "Compl.") ¶¶ 58–95.

            Before the Court are three motions for summary judgment and four motions relating to

the admissibility or scope of expert or fact witness testimony.  Specifically, the pending motions

1

are: (1) LoanCare's Motion for Partial Summary Judgment (the "LoanCare Motion," Dkt. Nos. 83, 84); (2) ICS's Motion for Summary Judgment (the "ICS Motion," Dkt. No. 92); (3) Dimont's Motion for Summary Judgment (the "Dimont Motion," Dkt. No. 100) (collectively with the LoanCare Motion and the ICS Motion, the "Motions for Summary Judgment"); (4) LoanCare's Motion to Exclude Dimont's Proposed Expert, Michael S. Waldron (the "LoanCare *Daubert* Motion," Dkt. No. 80); (5) ICS's Motion to Strike LoanCare's Proposed Expert, Marcel Bryar (the "ICS *Daubert* Motion," Dkt. No. 90); (6) Dimont's Motion to Exclude Marcel Bryar (the "Dimont *Daubert* Motion," Dkt. No. 94) (collectively with the LoanCare *Daubert* Motion and the ICS *Daubert* Motion, the "*Daubert* Motions"); and (7) Dimont's Motion to Preclude Plaintiff's Fact Witnesses from Proffering Opinions and Strike Such Testimony (the "Dimont Motion *In Limine*," Dkt. No. 97).

For the reasons set forth below, the LoanCare Motion is DENIED, the Dimont Motion is GRANTED in part and DENIED in part, the ICS Motion is GRANTED in part and DENIED in part, the LoanCare *Daubert* Motion is GRANTED in part and DENIED in part, the Dimont *Daubert* Motion is DENIED, the Dimont Motion *In Limine* is DENIED, and the ICS *Daubert* Motion is DENIED as moot.

## BACKGROUND

### I.    FACTUAL BACKGROUND

The following facts, taken from the pleadings and the admissible materials submitted by the parties in connection with their cross-motions for summary judgment, are either undisputed or described in the light most favorable to the relevant non-moving party.[1] *See Simon v. City of New York*, 893 F.3d 83, 91 (2d Cir. 2018).

---

[1] Where a fact stated in a movant's Rule 56.1 Statement is supported by evidence and controverted only by a conclusory statement by the opposing party, the Court finds that fact to be true.

### A.  The Parties

Plaintiff LoanCare is a Delaware limited liability company with its principal place of business located in Virginia Beach, VA, whose members are citizens of Delaware and Florida. Compl. ¶ 13.  LoanCare is a loan subservicer and subservices a variety of residential mortgage loans, including from the Federal Housing Authority ("FHA"), the Veterans Administration ("VA"), and the United States Department of Agriculture ("USDA") (individually, an "Agency" and collectively, "the Agencies").  Dkt. No. 138 ("LoanCare 56.1") ¶¶ 1–2.  LoanCare services loans for the loan's owner or the entity that owns the servicing rights to the loans.  *Id*. ¶ 3. LoanCare's servicing duties include submitting claims (generally referred to by the parties as "investor claims") to the Agencies to recover losses and expenses incurred by LoanCare in connection with the servicing of delinquent or defaulted Agency loans.  *Id*.

Defendant Dimont is a limited liability company whose sole member is a citizen of Pennsylvania.  *See* Compl. ¶ 14.  Since 2017, Dimont processed investor claims for servicers and subservicers such as LoanCare.  LoanCare 56.1 ¶ 5; Dkt. No. 145 ("Dimont 56.1 Response") ¶ 5.

Defendant ICS is a Texas limited liability company whose sole member is a citizen of Texas.  Compl. ¶ 15; Dkt. No. 37 ("ICS Answer") ¶ 15.  In April 2022, ICS purchased Dimont's investor claims business for $200,000.  Compl. ¶ 15; ICS Answer ¶ 15; LoanCare 56.1 ¶¶ 6–7; Dimont 56.1 Response ¶¶ 6–7.

---

*See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id*. at 56.1(d) ("Each statement by the movant or opponent under Rule 56.1(a) and (b), including each statement denying and controverting any statement of material fact, must be followed by citation to evidence that would be admissible and set forth as required by Fed. R. Civ. P. 56(c).").  Where one party agrees fully with a fact set forth in the other's Rule 56.1 Statement, the Court cites only to the Rule 56.1 Statement of the party originally stating the fact. Citations to a Rule 56.1 Statement incorporate by reference the documents cited therein.

**B.  The Investor Claims Process**

Loan subservicers, like LoanCare, manage loans for their owners by collecting loan payments and responding to borrower inquiries.  LoanCare 56.1 ¶ 8.  If a borrower defaults and the property is sold at foreclosure or otherwise disposed of, the owner of the loan sometimes incurs a loss as the result of unrecovered costs, expenses, or lost interest, among other items.  *Id*. ¶¶ 10–13.  If a loan is federally insured, the Agencies will reimburse the owner of the loans for costs and expenses that are lost as a result of a default.  *Id*. ¶¶ 15–18.  In order to receive the reimbursement, the owner of the loan (or the subservicer acting on the loan owner's behalf) must follow the specific procedures set forth by the Agency that has insured that particular loan.  *Id*. Each Agency has its own unique process and guidelines for submitting investor claims, compliance with which is required to receive the relevant reimbursement.  *Id*. ¶¶ 19–20, 24, 25–29 (FHA claims), ¶¶ 30–36 (VA claims), ¶¶ 37–40 (USDA claims).

**C.  The LoanCare-Lakeview Relationship**

LoanCare and Lakeview Loan Servicing ("Lakeview")[2] are parties to an Amended and Restated Subservicing Agreement effective April 1, 2020, which amended and restated a prior Subservicing Agreement between LoanCare and Lakeview, effective June 1, 2015.  LoanCare 56.1 ¶ 47 & Exs. 5 (the "2020 SSA"), 6 (the "2015 SSA," and together with the 2020 SSA, the "Lakeview SSA").[3]  The Lakeview SSA sets forth the obligations that LoanCare, the subservicer, owes to Lakeview, the loan owner, with respect to loan servicing.  LoanCare 56.1 ¶

---

[2] Lakeview is not a party to this action.

[3] Dimont disputes the admissibility of the 2015 SSA on the basis that "it was not produced until January 8, 2024, after the close of fact and expert discovery.  Dimont 56.1 Response ¶ 47.  Pursuant to Rule 37 of the Federal Rules of Civil Procedure, the Court retains discretion to preclude evidence as a sanction for failure to disclose or cooperate in discovery—however, in the absence of any claim or showing of prejudice to Dimont, the Court finds that there is no basis to preclude the 2015 SSA for purposes of this Opinion.  *See* Fed. R. Civ. P. 37.

48.  Under the Lakeview SSA, LoanCare was responsible for submitting investor claims, prepared in accordance with Agency guidelines, to the Agencies to recover losses and expenses incurred by LoanCare (and reimbursed by Lakeview) in connection with the servicing of delinquent Agency loans.  *Id.*; *see also* 2020 SSA §§ 2.2(a), 2.3(o), 2.5(d).  Under the terms of the Lakeview SSA, LoanCare also regularly conducted loss analysis on Lakeview's FHA, VA, and USDA loans to identify unrecovered amounts that were claimable from those Agencies and the reason for the nonrecovery.  LoanCare 56.1 ¶¶ 49–51.  Loss analysis consists of four parts: (1) identifying claimable amounts pursuant to Agency guidelines and industry standards; (2) identifying the amounts actually recovered from the Agencies; (3) reconciling those two numbers to identify the unrecovered but claimable amounts; and (4) identifying the root cause of the unrecovered amounts, such as untimely filing, claimable amounts that were not claimed, or unrecovered amounts due to an error in claim filing (such as incorrect or missing necessary information or supporting documentation).  *See id.*

Lakeview and LoanCare entered into SOW #2018-02 effective June 16, 2018 (the "Lakeview SOW") pursuant to which LoanCare agreed to complete a loss analysis for all loans subject to potential FHA, VA, or USDA claims, including FHA Part A and B, VA Guaranty, or USDA claims.  *Id.* ¶¶ 52–54 & Ex. 7.  Pursuant to the terms of the Lakeview SOW, if an identified loss was due to a subservicer error, LoanCare was obligated to indemnify and reimburse Lakeview for those losses.  LoanCare 56.1 ¶¶ 56–58 & Ex. 7 at 2, 3 (indemnification and reimbursement provisions).

### D.  The LoanCare-Dimont Master Services Agreement and Statements of Work

In 2018, Dimont was retained by LoanCare to assist in performing loss analysis work.  LoanCare 56.1 ¶ 59.  On December 26, 2018, LoanCare and Dimont entered into a Master Services Agreement (the "MSA").  *Id.* ¶ 60 & Ex. 9.  Pursuant to the MSA, the parties agreed to

enter into statements of work to describe the services to be performed by Dimont for LoanCare. LoanCare 56.1 ¶ 61.  In the MSA, Dimont agreed to perform the services described in the statements of work "*in a timely and professional manner*."  MSA § 8 (emphasis added).  The phrase "timely and professional manner" is not defined in the MSA.

The parties further agreed that except with respect to confidentiality and indemnity obligations set forth in the MSA, or gross negligence and willful misconduct of a party, neither would be liable for consequential damages, and limited all other liability as follows:

> [ . . . ] (II) THE TOTAL AGGREGATE LIABILITY OF DIMONT TO [LOANCARE] FOR ANY REASON SHALL NOT EXCEED THE GREATER OF (A) TOTAL FEES RECEIVED BY DIMONT UNDER THIS AGREEMENT DURING THE IMMEDIATELY PRECEDING TWELVE MONTHS, OR (B) TWO MILLION DOLLARS ($2,000,000).

LoanCare 56.1 ¶ 64; MSA § 9.  To clarify the exceptions to this limitation of liability provision, the parties specified that:

> FOR AVOIDANCE OF DOUBT, CONFIDENTIALITY AND INDEMNITY OBLIGATIONS SET FORTH HEREIN, AND GROSS NEGLIGENCE AND WILLFUL MISCONDUCT FROM THE PARTIES ARE ALSO EXCLUDED FROM THE PROVISIONS SET FORTH IN SECTION 9(II) HEREIN.

MSA § 9.  Furthermore, the MSA provided that Dimont was required to:

> [D]efend, indemnify and hold [LoanCare] . . . harmless from and against any and all claims, liabilities, damages, costs and expenses (including reasonable attorneys' fees) arising from (i) any grossly negligent act or omission or willful misconduct of Dimont or Dimont Agents, (ii) Dimont's breach or violation of any representation, warranty or covenant of Dimont contained in [the MSA] or any SOW . . . [.]

MSA § 10.

On December 26, 2018, LoanCare and Dimont entered into the first statement of work ("SOW #1").  LoanCare 56.1 ¶ 66 & Ex. 11.  And on July 29, 2019, LoanCare and Dimont

entered into the second statement of work ("SOW #2"). LoanCare 56.1 ¶ 69 & Ex. 12. SOW #2

required Dimont to complete the following investor claims processing services:

> DIMONT will access [LoanCare]-designated systems and Cloud Claims systems to acquire any needed data or supporting documentation needed and to prepare and file the claim.
>
> For ongoing flow work, DIMONT must request any missing documentation necessary to file or support the claim from [LoanCare] within 2 business days of receipt of the assigned loan from [LoanCare]. If there is no response, DIMONT must proceed with a second request to [LoanCare] within two (2) business days of the first request.
>
> DIMONT will complete, validate and submit claims on behalf of [LoanCare] to HUD.
>
> All claims will be prepared and filed by DIMONT in accordance with the [LoanCare]'s directions and, subject to Section 7 herein, within the Service Level Agreement timelines in Section 3 herein.
>
> [ . . . ]
>
> DIMONT will confirm claim receipt by the applicable agency or investor, insurer, or GSE, and monitor and follow-up for payment on claim submissions as directed by [LoanCare].

LoanCare 56.1 ¶ 69 & Ex. 12 §§ 1.3(i)–(iv), (vi). SOW #2 further outlines the Agencies' claim

processing services pursuant to standard service level agreements organized by claim type, *see*

LoanCare 56.1, Ex. 12 § 3.0, and states that Dimont must conduct loss analysis within 45 days of

the final claim payment. LoanCare 56.1 ¶¶ 70–71 & Ex. 12 § 3.0. Under SOW #2, LoanCare

also agreed to provide Dimont with access to its systems and applications necessary to prepare

and submit investor claims, provide a point of contact for any escalated questions or issues, and

provide information or authorizations as reasonably requested by Dimont. LoanCare 56.1 ¶ 72 &

Ex. 12 § 4.0. In total, LoanCare paid Dimont a total of $3,217,844 for services rendered under

the MSA and SOWs. LoanCare 56.1 ¶ 73.

In 2020, LoanCare determined that Dimont was not performing its investor claims work in accordance with Agency guidelines and industry standard by not filing supplemental claims, which Dimont disputed it was required to do under the MSA, SOW, or otherwise.  LoanCare 56.1 ¶¶ 74–76.  To address this, effective September 17, 2020, LoanCare and Dimont entered into an amendment to SOW #2 (the "First Amendment") to explicitly add "Supplemental Claims Review/File (All Types)" as a required service under Section 3.  LoanCare 56.1 ¶ 77 & Ex. 15 § 3 (stating that Dimont must "[r]eview claim payment and trailing invoices . . . to determine if [a] supplemental claim [is] required" and to "[f]ile claim[s] if necessary").  And, effective August 31, 2021, LoanCare and Dimont entered into a further amendment to SOW #2 (the "Second Amendment") that altered certain terms of Sections 1.2, 3.0, and 6.0 of SOW #2.  LoanCare 56.1 ¶ 79 & Ex. 16.  The MSA, SOW #2, the First Amendment, and the Second Amendment are hereinafter referred to collectively as the "Contract."

### E.  LoanCare Accuses Dimont of Errors and Terminates the Contract

LoanCare alleges, and Dimont firmly disputes, that Dimont's improper staffing and training led it to make numerous and repeated errors in investor claims filings and to miss multiple claim filing deadlines throughout the life of the Contract, resulting in significant losses to LoanCare.  *See* LoanCare 56.1 ¶¶ 88–99; Dimont 56.1 Response ¶¶ 88–99.  In July 2021, LoanCare began conducting loss analysis with respect to the investor claims filed by Dimont for LoanCare over the course of the Contract.  LoanCare 56.1 ¶ 100.  In August 2021, LoanCare sent a "formal notice" to Dimont of "repeated adverse Claim Quality Control findings," which were "identified multiple times over the last year starting in December 2020."  *Id*. ¶ 101.  After this notice, LoanCare and Dimont met in September 2021 to discuss how Dimont should address these alleged deficiencies, *id*. ¶ 102, and on December 2, 2021, LoanCare provided formal notice

to Dimont of $709,005.20 in losses allegedly resulting from Dimont's errors or omissions in the claims process, *id.* ¶ 103.[4]

On March 7, 2022, LoanCare issued a Termination Notice to Dimont terminating the Contract. *Id.* ¶ 110 & Ex. 26. LoanCare requested in the Termination Notice that Dimont continue to provide transition services under the MSA until August 2022. LoanCare 56.1 ¶ 115. The Termination Notice further advised Dimont that LoanCare expected payment for outstanding loss claim demands and that it would be submitting additional demands prior to the termination date. *Id.* ¶ 116.

### F. Dimont Sells its Investor Claims Business to ICS

In or around late 2021, Metro Public Adjustment ("MPA"), Dimont's parent company, decided to sell Dimont's investor claims division, LoanCare 56.1 ¶ 105, and on January 19, 2022, ICS was formed to acquire and continue Dimont's investor claims processing business, *id.* ¶ 111. In February 2022, ICS and Dimont signed an asset purchase agreement (the "APA") to initiate due diligence on the transaction. *Id.* ¶ 112; *see also* Dkt. No. 92-2 (the "ICS 56.1") ¶ 4 & Ex. D. The APA expressly excluded certain assets from the purchase, including "All Master Services Agreements or similar agreements (each an "MSA") with clients of the Business to the extent that [Dimont] will continue to do other work or perform other services under such MSAs for such clients after closing (i.e. hazard claims serices [sic][.]" ICS 56.1 ¶ 6 & Ex. D § 1.2(f). The APA further limited the assignments from Dimont to ICS in the "Limitations on Assignments; Management Agreement" provision, which states: "[n]othing in this Agreement

---

[4] Dimont disputes that LoanCare appended Exhibit 5 from the deposition of Steven McCaffery in support of its motion for summary judgment. Dimont 56.1 Response ¶ 104. Exhibit 25 to LoanCare's 56.1 Statement of Undisputed Facts includes excerpts from the McCaffery deposition as well as a document marked "Plaintiff's Exhibit 5."

shall be construed as an attempt or agreement to assign any Assumed Contract, sales order, purchase order or other commitment of [Dimont] which is non-assignable without the consent of the other party or parties thereto unless such consent shall have been given, including, without limitation, items constituting Work in Progress."  ICS 56.1 ¶ 10 & Ex. D § 1.5.

In April 2022, the sale closed for $200,000, contingent on Dimont's existing clients re-signing agreements with ICS.  LoanCare 56.1 ¶ 118.  ICS was aware of the Termination Notice from LoanCare prior to the closing.  *Id*. ¶ 113; ICS 56.1 ¶ 15.  In order to obtain LoanCare's consent to the assignment of Dimont's investor claims business to ICS, Dimont sent LoanCare a "Consent and Acknowledgement" dated March 29, 2022, pursuant to which LoanCare would agree to consent to the subcontracting and/or assignment of Dimont's obligations under the MSA and SOWs.  LoanCare 56.1 ¶ 117 & Ex. 27.  LoanCare did not sign the Consent and Acknowledgement.  LoanCare 56.1 ¶¶ 117, 119.  ICS acknowledged that the LoanCare MSA and SOWs were not assigned from Dimont to ICS at the closing.  ICS 56.1 ¶ 15.  Despite this, ICS prepared investor claims filings for LoanCare from the closing through June 8, 2022.  *Id*. ¶ 122.

### G.  LoanCare Seeks Indemnification from Dimont and Indemnifies Lakeview

On April 21, 2022, LoanCare served Dimont with an Indemnification Notice identifying alleged losses in the amount of $3,093,219.52 and reserving its rights to allege further losses upon continuing review of claims.  LoanCare 56.1 ¶¶ 123–24.  To date, Dimont has not indemnified LoanCare in response to the Indemnification Notice.  *Id*. ¶ 126.

To arrive at the claimed loss amount, LoanCare prepared a spreadsheet that allegedly includes "material errors and omissions" in Dimont's processing of various Agency claims and the resulting financial losses to LoanCare; Dimont strongly disputes the accuracy of the loss spreadsheet and the contentions asserted therein.  *Id*. ¶¶ 129–39; Dimont 56.1 Response ¶¶ 129–

10

39; Brown Amend. Decl. Ex. A.  Ultimately, LoanCare believed it was contractually obligated to indemnify and pay Lakeview $4,424,897 for losses LoanCare alleges were caused by Dimont's subpar performance.  LoanCare 56.1 ¶ 139.  LoanCare made installment payments to Lakeview to satisfy this indemnification obligation.  LoanCare 56.1 ¶¶ 139–40.

## II.    PROCEDURAL HISTORY

LoanCare initiated this action by complaint on October 28, 2022.  *See* Dkt. No. 1.  On November 1, 2022, Judge Jesse M. Furman, the District Judge formerly assigned to this matter, ordered LoanCare to amend its Complaint to affirmatively allege the citizenship of each constituent person or entity comprising itself and Defendants.  *See* Dkt. No. 9.  On November 3, 2022, LoanCare filed an Amended Complaint, *see* Dkt. No. 10, but did not cure the jurisdictional pleading defects identified by the Court.  The Court therefore ordered LoanCare to amend again, and on November 7, 2022, LoanCare filed a Second Amended Complaint.  *See* Dkt. Nos. 11, 12. The Second Amended Complaint once again did not cure the identified jurisdictional defects, but LoanCare was granted "one final time" to cure, which LoanCare did on November 14, 2022 by filing the Third Amended Complaint.  *See* Dkt. Nos. 13, 14.

On December 12, 2022, ICS moved to dismiss the action for lack of personal jurisdiction, *see* Dkt. No. 21, and the Court allowed LoanCare to amend the operative complaint to address the arguments raised in the motion.  Dkt. No. 24.  Plaintiff filed the Fourth Amended Complaint on January 6, 2023.  Dkt. No. 25 (the "Complaint" or "Compl.").  On January 13, 2023, ICS moved once again to dismiss for lack of personal jurisdiction, *see* Dkt. No. 26, and on January 20, 2023, Dimont answered the Complaint, *see* Dkt. No. 28.  LoanCare opposed ICS's motion on January 27, 2023, and ICS replied on February 3, 2023.  *See* Dkt. Nos. 30, 31.  On February 9, 2023, the Court denied ICS's motion to dismiss due to the fact that LoanCare's "well-pleaded

allegations in the [Complaint] . . . establish a *prima facie* showing that ICS is bound by the forum selection clause in the Master Services Agreement, which is sufficient at this stage of the litigation." Dkt. No. 32.

On January 6, 2024, ICS filed another motion to dismiss for lack of personal jurisdiction and improper venue, *see* Dkt. No. 68, which it amended on January 8, 2024, *see* Dkt. No. 70. On January 17, 2024, the Court again denied ICS's motion to dismiss without prejudice to renewal "in its anticipated cross-motion for summary judgment." Dkt. No. 74. The order denying ICS's motion further stated that "[a]ll parties acknowledge that ICS will not waive its jurisdictional defense by moving for summary judgment on that ground." *Id*. On January 19, 2024, the Court set a briefing schedule for the motions and cross-motions for summary judgment. *See* Dkt. No. 78. On February 16, 2024, this case was reassigned to the undersigned. *See* Dkt. No. 79.

On March 4, 2024, LoanCare moved to strike Dimont's proposed expert witness, Michael S. Waldron, and for partial summary judgment. Dkt. Nos. 80–86. On April 18, 2024, ICS moved to strike LoanCare's proposed expert witness, Marcel Bryar, and cross-moved for summary judgment. *See* Dkt. Nos. 90, 91–93. On the same day, Dimont cross-moved for summary judgment and to preclude certain testimony of Marcel Bryar. *See* Dkt. Nos. 94–108. After responsive and reply briefing, this Opinion and Order on all pending motions followed.

## DISCUSSION

## I.    THE MOTIONS FOR SUMMARY JUDGMENT

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of proving the absence of a question of material fact. *See* Fed. R. Civ.

P. 56(a).  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). When cross-motions for summary judgment are made, the same standards apply.  *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Id.*

All three parties have moved for summary judgment in this action.  First, LoanCare moves for partial summary judgment solely on liability regarding its breach of contract and indemnification claims against Dimont and ICS, reserving an assessment of damages for trial. *See* Dkt. No. 130.  Second, in addition to opposing LoanCare's motion, Dimont affirmatively moves for summary judgment dismissing all of LoanCare's claims against it.  *See* Dkt. No. 141- 1.  Finally, ICS moves for summary judgment dismissing all of LoanCare's claims against it for lack of personal jurisdiction or, in the alternative, because ICS has no privity of contract under which LoanCare can sustain its breach of contract claims against it.  *See* Dkt. No. 93.  Each of these motions is examined and discussed below.

## A.  The LoanCare Motion

In the LoanCare Motion, LoanCare seeks partial summary judgment with respect to liability on its claims that (1) Dimont breached the MSA by failing to perform its contractual obligations in a "timely and professional manner," *see* MSA § 8, resulting in damages to LoanCare; and (2) Dimont breached the Contract's indemnification provision by failing to cover

LoanCare's liabilities to Lakeview.[5]  For the reasons discussed below, the LoanCare Motion is

DENIED.

### 1.  The Breach of Contract Claim

"Under New York law,[6] a breach of contract claim requires proof of (1) an agreement,

(2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."

*Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).  Here, there is no

dispute about the existence of an agreement (the Contract) or LoanCare's performance.  Rather,

the parties' disputes turn on (1) the interpretation of provisions of the Contract and (2) factual

questions regarding whether Defendants have breached its terms.

On a breach of contract claim, summary judgment is appropriate only where the contract

is wholly unambiguous.  *See Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115

(2d Cir. 1994).  A contract is ambiguous where "a reasonably intelligent person viewing the

contract objectively could interpret the language in more than one way."  *Topps Co. v. Cadbury*

*Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  To the extent a party's summary judgment motion

"hinges on ambiguous contract language," a court may grant summary judgment "only if the

ambiguities may be resolved through extrinsic evidence that is itself capable of only one

interpretation, or where there is no extrinsic evidence that would support a resolution of these

ambiguities in favor of the nonmoving party's case."  *Id*.

LoanCare alleges that Dimont breached the Contract in two ways: (1) by failing to

perform the services required under the MSA in a "timely and professional manner," *see* MSA

---

[5] The assertion of these claims against ICS is based entirely on successor liability.  *See* LoanCare Motion at 14 n.11.

[6] No party disputes that New York law governs the agreements at issue in this dispute.  *See* MSA § 13 ("This Agreement shall be governed by, and its provisions construed in accordance with the laws of New York, without regard to its conflict of law provisions.").

§ 8, and (2) by failing to perform the services required under the MSA "in accordance with [LoanCare's] instructions and, [pursuant to] the Service Level Agreement[s]" as set forth in the SOWs, *see* LoanCare 56.1 ¶¶ 69–70 & Ex. 12.  *See* LoanCare Motion at 16–18.[7]  For the reasons discussed below, neither theory of breach can be resolved on summary judgment.

### i.    The Meaning of "*Timely and Professional Manner*" in MSA § 8 is Ambiguous

Under New York law, "a contract is ambiguous if the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Riverside S. Plan. Corp. v. CRP/Extell Riverside, L.P.*, 60 A.D.3d 61, 66 (1st Dep't 2008), *aff'd*, 13 N.Y.3d 398 (2009) (citation omitted).   Under the MSA, Dimont agreed to perform the services described in the SOWs "in a timely and professional manner."  MSA § 8. The MSA does not define this phrase or any of its constituent terms, nor assign the determination of their meaning to one of the parties, and the Court cannot independently divine an unambiguous meaning from them.  First, "timely" and "professional" are both indefinite and subjective terms with multiple potential meanings.[8]  Second, even LoanCare's proposed meaning of the phrase includes inherent ambiguity as to what the parties considered encompassed within

---

[7] Although LoanCare appears to assert a separate breach of contract claim in its motion for summary judgment under the SOWs, the Complaint only identifies breach of contract claims under MSA § 8 (Representations and Warranties) and MSA § 10 (Indemnification).  *See* Compl. ¶¶ 58–69, 70–76. For the purposes of efficiently resolving both the LoanCare Motion and Dimont Motion, the Court herein addresses the breach claim under the SOWs as well, but in doing so does not preclude Dimont from raising a defense that such theory was not properly asserted in the pleadings and should thus not be heard at trial.  *See Wallert v. Atlan*, 141 F. Supp. 3d 258, 286 (S.D.N.Y. 2015) (a complaint must identify, in non-conclusory fashion, the specific terms of the contract that a defendant has breached) (citing *Spinelli v. Nat'l Football League*, 96 F.Supp.3d 81, 131 (S.D.N.Y.2015)).

[8] For example, "timely" could mean done by a certain deadline, or it could mean "appropriate or adapted to the times or the occasion."  *See* Timely, Merriam-Webster, https://www.merriam-webster.com/dictionary/timely (last visited Mar. 28, 2025).  Likewise, Merriam Webster's Dictionary lists three separate definitions for the adjective "professional," each of which has multiple sub-definitions.  *See* Professional, Merriam-Webster, https://www.merriam-webster.com/dictionary/professional (last visited Mar. 28, 2025).

"professional manner."  *See* LoanCare Motion at 17 (arguing the term required Dimont to "perform the Services in a manner consistent with the standards of the investor claims industry[,]" which are "governed by the Agencies' guidelines").  Thus, even assuming LoanCare's proposed definition is the one the parties intended to govern, a trier of fact determining whether Dimont breached this provision would require expert testimony regarding the "standards of the investor claims industry" to reach its conclusion on the particular requirements of the MSA and what would constitute a breach.  Thus, discerning no clear, definite meaning from the text of the MSA, the Court finds the contractual language at issue to be ambiguous.  *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d at 465–66 (2d Cir. 2010); *see also Mellon Bank, N.A.*, 31 F.3d at 116 (finding contract ambiguous "[g]iven the two conflicting reasonable interpretations").

Typically, the Court would review evidence extrinsic to the Contract to resolve the ambiguity but, as discussed further below with respect to LoanCare's claim that Dimont breached the terms of the SOWs, *see infra* § I(A)(1)(ii), the material facts regarding the parties' bargaining history and post-formation conduct that could potentially aid the Court in resolving such ambiguity are strongly disputed.  Thus, given the ambiguity of the contractual language and the conflicting extrinsic evidence of the parties' intent and understanding of that language, the Court finds that there are genuine disputes of fact with respect to whether Dimont's actions breached this term of the MSA.  *See Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (explaining that where contractual language is susceptible to differing reasonable interpretations and "where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact" (citations omitted)).  Summary judgment therefore cannot be granted to LoanCare on its first theory of breach.

ii.    **Genuine Disputes of Material Fact Exist as to Whether Dimont Complied with LoanCare's Directions and the Service Level Agreements**

As to LoanCare's second theory of breach, LoanCare cites the terms of SOW #2, which states in relevant part that:

> All claims will be prepared and filed by DIMONT in accordance with the [LoanCare]'s directions and, subject to Section 7 herein, with the Service Level Agreement timelines in Section 3 herein.

LoanCare 56.1 ¶ 69 & Ex. 12 § 1.3. The Service Level Agreements contained in Section 3.0 of SOW #2 for "Claim Preparation and Filing" outline the claim processing services pursuant to standard service level agreements. *See* LoanCare 56.1 ¶ 69 & Ex. 12 § 1.3. The First Amendment also added additional tables that set forth Dimont's obligations on supplemental claims at each Agency. *See* LoanCare 56.1 ¶¶ 77–78; First Amendment § 3. LoanCare contends, at a high level, that improper staffing and training led Dimont to make repeated errors in its investor claims filings in contravention of the requirements set forth in these Service Level Agreements. *See* LoanCare 56.1 ¶¶ 87, 97–102, 108, 133–34, 136–37. But the Court finds genuine disputes of material fact that preclude the Court from determining on summary judgment whether Dimont indeed breached these provisions.

"A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (second quoting *Anderson*, 477 U.S. at 249–50). Dimont disputes the vast majority of LoanCare's contentions about its staffing and training procedures, and in so doing cites record evidence that cannot be

evaluated without making credibility assessments that are within the traditional province of a jury. *See, e.g.*, Dimont 56.1 Response ¶ 93 (stating that Dimont "did have a training program that would be adjusted depending on the employee's experience level" and had "client specific training" and citing to witness declaration and deposition transcript); *id*. ¶ 94 (disputing claim that Dimont had no training materials or written procedures and citing to deposition transcripts and record evidence discussing training materials); *id*. ¶ 99 (stating that delays in filing supplemental claims were due to "LoanCare's failure to provide responsive documents in a timely fashion" and citing to record evidence). Because the record contains contradictory evidence on relevant questions and a reasonable jury could review such evidence and find that Dimont did not breach the contract, *Horror Inc.*, 15 F.4th at 241, summary judgment for LoanCare on its second breach theory is likewise inappropriate.

### 2. The Indemnification Claim

"A party is entitled to full contractual indemnification provided that the 'intention to indemnify can be clearly implied from the language and purposes of the entire agreement and the surrounding facts and circumstances.'" *Drzewinski v. Atl. Scaffold & Ladder Co.*, 70 N.Y.2d 774, 777 (1987) (quoting *Margolin v. N.Y. Life Ins. Co.*, 32 N.Y.2d 149, 153 (1973)). "'The right to contractual indemnification depends upon the specific language of the contract.'" *Mejia v. Cohn*, 188 A.D.3d 1035, 1038 (2d Dep't 2020) (quoting *O'Donnell v. A.R. Fuels, Inc.*, 155 A.D.3d 644, 645 (2d Dep't 2017)). Pursuant to the Contract, Dimont agreed to indemnify LoanCare from "any and all claims, liabilities, damages, costs, and expenses (including reasonable attorneys' fees) arising from [ . . . ] (ii) Dimont's breach or violation of any representation, warranty or covenant of Dimont contained in [the MSA] or any SOW . . . [.]" MSA § 10. The parties' dispute as to the indemnity provision revolves around whether (1) the losses LoanCare incurred fall within the scope of the indemnity provision and (2) whether those

losses were the result of Dimont's "breach" of any "representation, warranty or covenant" in the Contract.

As to the first contention, the losses appear to fall within the scope of the unambiguous terms of the indemnity provision because they are, at least, "claims." The indemnity provision explicitly includes "claims" as a category for which Dimont may be required to indemnify LoanCare (if they result from gross negligence or a breach of the Contract, as set forth in MSA § 10). Pursuant to the terms of the Lakeview SOW, LoanCare was required to indemnify and reimburse losses to Lakeview that were caused by a subservicer error. *See* LoanCare 56.1 ¶¶ 56–58 & Ex. 7 at 2, 3. Thus, Lakeview had a contractually-based claim against LoanCare for losses arising from its subservicing work and the work done by its contractors, like Dimont.[9]

However, as to the second contention, pursuant to the unambiguous terms of the indemnity provision in the MSA, Dimont need indemnify LoanCare *only* if the claims arise from a breach of the Contract (specifically, a breach of "any representation, warranty or covenant of Dimont contained in [the MSA] or any SOW," MSA § 10). LoanCare argues that the losses "indisputably arise from Dimont's breach of its 'representation' in the MSA that it would perform the Services in a timely and professional manner . . . and its covenants in the Statements of Work to perform the Services in accordance with LoanCare's instructions and the Service Level Agreements." LoanCare Motion at 19 (internal citations omitted). But for the reasons discussed with respect to LoanCare's breach of contract claim, on the record currently before the Court, LoanCare cannot sustain as a matter of law that Dimont breached these terms of the MSA.

---

[9] Dimont vigorously disputes whether LoanCare has indemnification rights at all arising from a Lakeview claim, and further argues that LoanCare waived its indemnication rights by failing to comply with various procedures that Dimont asserts are required. *See* Dimont Motion at 10–17. The Court need not resolve these issues now, both because they turn on factual disputes and because the second step in the indemnification analysis clearly precludes summary judgment in any event.

Because whether LoanCare will prevail on its breach of contract claim remains unresolved, the Court cannot grant summary judgment as to LoanCare's contractual indemnification claim. *See P&E Props, Inc. v. United Nat. Foods, Inc.*, 713 F. Supp. 2d 262, 267 (S.D.N.Y. 2010) (denying summary judgment for contractual indemnification claim as premature because genuine issues of material fact regarding plaintiff's breach of contract claim remained).

* * *

For the reasons discussed above, genuine disputes of material fact prevent the Court from granting the LoanCare Motion on summary judgment, and it is thus DENIED.

### B.  The Dimont Motion

In addition to generally opposing the LoanCare Motion, Dimont affirmatively moves for summary judgment on three distinct issues: *first*, it seeks dismissal of the indemnification claims LoanCare brings under MSA § 10; *second*, it seeks dismissal of the breach of contract claim asserted by LoanCare under MSA § 8; and *third*, it seeks dismissal of any claim by LoanCare for attorney's fees asserted under MSA § 10. *See generally* Dimont Motion.  As to the first two points, for the reasons set forth above with respect to the LoanCare Motion, the Court has determined that genuine disputes of material fact exist with respect to LoanCare's breach and indemnification claims that preclude summary judgment for LoanCare.  These same disputes likewise preclude summary judgment dismissing the claims against Dimont, even when each motion is evaluated separately and drawing all inferences in favor of the non-moving party. Because the matters relevant to the ultimate outcome of the claims asserted against Dimont must be resolved at trial, the Dimont motion (insofar as it requests the Court dismiss these claims) is likewise DENIED.

As to Dimont's motion regarding LoanCare's assertions of attorney's fees, LoanCare does not appear to address this issue on opposition. *See generally* Dkt. No. 124.  Under New

York law, the intent to provide for legal fees as damages for breach of contract must be

"unmistakably clear" in the language of the contract.  *Hooper Assocs. v. AGS Computs., Inc.*, 74

N.Y.2d 487, 492 (1989); *see also Flores v. Las Ams. Commc'ns, Inc.*, 218 A.D.2d 595, 595 (1st

Dep't 1995) (memorandum decision), *leave to appeal dismissed in part and denied in part*, 87

N.Y.2d 1051 (1996).  MSA § 10 provides that Dimont is required to:

> [D]efend, indemnify and hold [LoanCare] . . . harmless from and against any and
> all claims, liabilities, damages, costs, and expenses (*including without limitation
> reasonable attorneys' fees*) arising from or related to (i) any grossly negligent act
> or omission or willful misconduct of Dimont or Dimont Agents, [or] (ii) Dimont's
> breach or violation of any representation, warranty or covenant of Dimont
> contained in [the MSA] or any SOW . . . [.]

MSA § 10 (emphasis added).  The Complaint asserts that, pursuant to this provision, "LoanCare

is entitled to be indemnified and reimbursed, and/or held harmless, for an amount to be proven at

trial, but not less than $4,059,180.26 *(inclusive of LoanCare's attorneys' fees, legal costs, and

other costs and expenses incurred in pursuing this action*) . . . [.]"  Compl. ¶ 69 (emphasis

added); *see also id.* ¶ 76 (same).

But MSA § 10 is entirely silent as to Dimont's indemnification responsibilities with

respect to claims between the parties, and "where, as here, the parties' intentions to provide

indemnification for claims between the parties is not 'unmistakably clear' from the language of

the promise, this Court cannot infer an intent to waive the benefit of the rule that parties are

responsible for their own attorneys' fees."  *Bourne Co. v. MPL Commc'ns, Inc.*, 751 F. Supp. 55,

58 (S.D.N.Y. 1990) (quoting *Hooper*, 74 N.Y.2d at 492); *see also Hooper*, 74 N.Y.2d at 492

(finding no promise by defendant to indemnify plaintiff for counsel fees in an action on the

contract where the terms of the indemnification provision did not "unequivocally refer[] to

claims between the parties").  As this aspect of Dimont's motion appears to be unopposed by

LoanCare, and the Court independently finds that the indemnification provision's language does

not support a claim for attorney's fees on the claims LoanCare asserts against Dimont in this action, this portion of the Dimont Motion is thus GRANTED.

* * *

For the reasons discussed above, the Dimont Motion is GRANTED in part and DENIED in part.

### C.  The ICS Motion

In the ICS Motion, in addition to opposing LoanCare's motion, ICS affirmatively moves on summary judgment on two issues: *first*, it moves for the dismissal of all claims asserted against it for lack of personal jurisdiction; and *second*, it moves to dismiss LoanCare's breach claims due to a lack of privity of contract between the parties.  *See generally* ICS Motion.  The Court addresses both issues below.

### 1.  The Court Has Personal Jurisdiction Over ICS Pursuant to the MSA's Forum Selection Clause

From the inception of this action, Defendant ICS has asserted that, as a Texas corporation that conducted all of its work within Texas, it is not subject to the jurisdiction of the Southern District of New York.  Specifically, it has claimed it has no contacts with New York and is insufficiently related to Dimont to subject it to the forum selection clause and choice of law provision in the Contract.  *See* ICS Motion at 9–10.

A signatory to a contract containing a forum selection clause may enforce the forum selection clause against a non-signatory when the non-signatory is "closely related" to another signatory, either as a successor in interest, a beneficiary, or other sufficiently close relationship such that it does not violate principles of foreseeability or fundamental fairness to allow enforcement against them.  *See, e.g., Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 723 (2d Cir. 2013); *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir.

22

2009) ("We find ample support for the conclusion that the fact a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause." (collecting cases)).

It is undisputed that the Contract contains a forum selection clause that makes venue in this Court proper. *See* MSA § 13 ("The exclusive venue for any formal legal action under this Agreement shall be in the federal or state courts in the State of New York[.]"). It is also undisputed that that the forum selection clause is valid and enforceable and that Dimont is thus bound by that forum selection clause. Indeed, "[f]orum selection clauses are *prima facie* valid" and should generally be enforced. *Magi XXI, Inc*, 714 F.3d at 720–21 (quoting *TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 475 (2d Cir. 2011)); *see also Martinez v. Bloomberg LP*, 740 F.3d 211, 218 (2d Cir. 2014) (noting that "[t]he presumptive enforceability of forum selection clauses reflects a strong federal public policy of its own"). As the Supreme Court has explained, "[t]he enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system," and should therefore be "given controlling weight in all but the most exceptional cases." *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013) (internal references omitted) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988)). This is especially so where the forum selection clause is the result of an arms-length transaction, as here. *See Magi XXI*, 714 F.3d at 721 ("We give substantial deference to the forum selected by the parties, particularly where this choice was made in an arm's-length negotiation by experienced and sophisticated businessmen.") (internal references omitted) (quoting *New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997)).

The only dispute, therefore, is whether ICS is sufficiently "closely related" to Dimont to be held to the Contract's forum selection clause. Under the above-stated principles, the Court finds that it is. The undisputed record before the Court reveals that ICS (1) purchased certain of Dimont's assets and entire investor claims business, (2) hired Dimont's investor claims employees, and (3) continued all operations and processing for Dimont's existing clients, including LoanCare. *See* LoanCare 56.1 ¶¶ 117–22. Even prior to the sale of Dimont's investor claims business to ICS, ICS was involved in the transaction, including by expressly agreeing to perform the Services for LoanCare under the MSA and then performing those Services. *See id.* at ¶ 122.

Like here, "[c]ourts have repeatedly found non-signatories closely related to signatories where their interests are completely derivative of and directly related to, if not predicated upon the signatory party's interests or conduct." *Zeta Glob. Corp. v. Maropost Mktg. Cloud, Inc.*, No. 20 Civ. 3951 (LGS), 2021 WL 1668134, at *5 (S.D.N.Y. Apr. 28, 2021) (internal references omitted) (quoting *KTV Media Int'l, Inc. v. Galaxy Grp., LA LLC*, 812 F. Supp. 2d 377, 386 (S.D.N.Y. 2011)); *see also Cuno, Inc. v. Hayward Indus. Prods., Inc.*, No. 03 Civ. 3076 (MBM), 2005 WL 1123877, at *6 (S.D.N.Y. May 10, 2005) (same); *Laspata DeCaro Studio Corp. v. Rimowa GmbH*, No. 16 Civ. 934 (LGS), 2017 WL 1906863, at *6 (S.D.N.Y. May 8, 2017) (finding non-signatory cross-claimants bound by a forum selection clause "because their crossclaims derive entirely from the terms of the agreement"); *In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 369 (S.D.N.Y. 2011) (non-signatory defendants were "closely related" where they were affiliates of the signatory hired to carry out its contractual obligations). Although the Court herein finds that ICS is not a successor in interest to Dimont, *see infra* § I(C)(2), personal jurisdiction is not dependent on that because the Second Circuit has made clear that "[t]he

enforceability of forum selection clauses as to non-signatories need not be limited to successors in interest." *Magi XXI*, 714 F.3d at 722. As ICS's interests—namely, its interest in Dimont's assets and investor claims business—are derivative of and directly related to Dimont's interests or conduct, ICS is bound to Contract's forum selection clause and choice of law provisions and thus, is subject to the jurisdiction of this Court. The ICS Motion to dismiss for lack of personal jurisdiction is thus DENIED.

### 2. ICS is Not a Successor to Dimont

However, under the traditional common law test applied in New York, there can be no dispute that ICS is not liable under the Contract as a successor-in-interest to Dimont. "Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006). There are four exceptions to this rule: (1) where the successor expressly or impliedly assumed the predecessor's tort liability; (2) where there was a consolidation or merger of seller and purchaser; (3) where the purchasing corporation was a mere continuation of the selling corporation; or (4) where the transaction is entered into fraudulently to escape such obligations. *Id*. (citations omitted).

This case does not fall within any of these four exceptions. There is no allegation that the APA was entered into fraudulently to escape any obligations, and in light of the provisions of the APA setting forth which liabilities were and were not transferred, there can be no dispute that ICS did not expressly or impliedly assume Dimont's liabilities as to claims from LoanCare.

Nor is there a genuine issue of material fact as to whether ICS was a "mere continuation" of Dimont or entered into a *de facto* merger with Dimont. Courts have held that the "*de facto* merger" and "mere continuation" exceptions are "so similar that they may be considered a single

25

exception." *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n.3 (2d Cir. 2003).  To find a *de facto* merger (or mere continuation), courts look to the following factors:

> (1) continuity of ownership; (2) cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3) assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and (4) continuity of management, personnel, physical location, assets, and general business operation.

*Nat'l Serv. Indus., Inc.*, 460 F.3d at 209.  The Second Circuit has explained that "'continuity of ownership is the essence of a merger,' . . . and therefore the exception cannot apply in its absence."  *Douglas v. Stamco*, 363 F. App'x 100, 102 (2d Cir. 2010) (quoting *Nat'l Serv. Indus., Inc.*, 460 F.3d at 211).  Here, there is no dispute that ownership of the business changed hands; thus, regardless of whether any other *de facto* merger factors are present, the *de facto* merger and "mere continuation" exceptions do not apply.  Accordingly, ICS is not liable as a successor to Dimont and, thus, the ICS Motion, with respect to liability, is GRANTED and Count Four in the Complaint, *see* Compl. ¶¶ 85–95 (asserting breach of contract claim against ICS as successor to Dimont), is DISMISSED.

* * *

For the foregoing reasons, the ICS Motion is GRANTED in part and DENIED in part.

## II.    THE *DAUBERT* MOTIONS

In addition to their motions for summary judgment, the parties bring three motions to exclude the testimony of two proposed experts in this case.  First, LoanCare moves to exclude the opinions and testimony of Dimont's proposed expert witness, Michael S. Waldron.  *See* Dkt. No. 80.  Second, Dimont moves to strike certain opinions of LoanCare's proposed expert, Marcel Bryar, contained in his expert report.  *See* Dkt. No. 94.  Third, ICS moves to strike any testimony

or opinions of Mr. Bryar relating to any alleged wrongdoing or mishandling of claims by ICS.
*See* Dkt. No. 90.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of
Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill,
experience, training, or education may testify" to his or her opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods
> to the facts of the case.

Fed. R. Evid. 702.  "[T]he proponent of expert testimony has the burden of establishing by a
preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."
*United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  In *Daubert v. Merrell Dow
Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of
district courts with respect to expert testimony, declaring that "the Rules of Evidence —
especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony
both rests on a reliable foundation and is relevant to the task at hand."  *Id*. at 597; *see also
Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001).

"The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of
the particular case at issue."  *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543
(JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal references omitted); *see also
Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–52 (1999) (explaining that because "there are
many different kinds of experts, and many different kinds of expertise," a court must be granted
"considerable leeway in deciding in a particular case how to go about determining whether
particular expert testimony is reliable").  The focus of the Court's analysis "must be solely on

principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at

595.  Ultimately, "expert testimony should be excluded if it is speculative or conjectural, or if it

is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be

in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18,

21 (2d Cir. 1996) (internal references and citations omitted).  The Court should not "admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen.*

*Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Expert testimony regarding "an ultimate

determination that [is] exclusively within [the jury's] province," including witness credibility,

must be precluded, *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), as must an

expert's testimony "on issues of law," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.

1991).

By contrast, "other contentions that the assumptions are unfounded go to the weight, not

the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal references omitted).

"[T]he traditional and appropriate means of attacking shaky but admissible evidence" is not

exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.  Moreover, "[a]lthough a

district court should admit expert testimony only where it is offered by a qualified expert and is

relevant and reliable, exclusion remains the exception rather than the rule." *In re Gen. Motors*,

2016 WL 4077117, at *2 (internal references and citation omitted); *see also Nimely*, 414 F.3d at

395 ("Rule 702 embodies a liberal standard of admissibility for expert opinions . . . .").

### A.  The LoanCare *Daubert* Motion

LoanCare moves, pursuant to Federal Rule of Evidence 702 and the tenets of *Daubert*

outlined above, for an order excluding Dimont's proposed expert, Michael S. Waldron, from

proffering testimony in this case.  *See* LoanCare *Daubert* Motion at 1–2.  Dimont offers Mr.

Waldron as an expert to "review the claims that [LoanCare] alleges that Dimont improperly serviced and to opine on the parties' respective obligations in light of the terms of the various agreements involved and standard industry practice." Dkt. No. 81-1 ("Waldron Report") at 2, Introduction ¶ 2 . LoanCare argues for exclusion on the grounds that: (1) Mr. Waldron is not qualified as an expert in "statistical sampling"; (2) Mr. Waldron impermissibly relied on a separate "statistical expert," Rick Needles, who was not disclosed to LoanCare or noticed by Dimont as a separate expert witness; (3) the opinions Mr. Waldron offers are not relevant to LoanCare's claims; (4) many of Mr. Waldron's proffered opinions amount to ultimate legal conclusions; and (5) Mr. Waldron's opinion on Dimont's training is improper because it falls outside of his alleged expertise. *See* LoanCare *Daubert* Motion at 1–2. Below, the Court discusses each contention in turn.

### 1. Mr. Waldron is Qualified to Opine on the Issues in his Report

LoanCare asserts, first, that Mr. Waldron should be precluded from testifying because he is not qualified to opine as an expert in "statistical sampling." *See* LoanCare *Daubert* Motion at 7–9. As a threshold matter, Mr. Waldron is not offered as an expert in statistical sampling. Rather, the "overall opinion" he reaches in his report is with respect to the cause of the "errors and losses at issue in this case," which he opines were largely due to LoanCare's "own actions and inactions" that "negatively impacted Dimont's performance and the claims process." Waldron Report at 6, Summary of Analysis, Observations and Opinions ¶ 5. To reach that opinion, it is true that he undertook data analysis consisting of analyzing "three samples" that were, in his words, "designed to provide us with the most relevant and comprehensive opportunity to assess the overall population within the time constraints given." *Id*. at 10, Sampling Approach ¶ 3. But nowhere in the Waldron Report does Mr. Waldron claim to be an expert in statistical sampling.

As to whether Mr. Waldron is qualified as an expert to provide the opinion he ultimately reaches in his report, the Court finds that he is. Courts in this district often describe the analysis of an expert's qualifications as comprising two subparts. *See, e.g., 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 641–42 (S.D.N.Y. 2014); *Arista Records LLC v. Lime Grp. LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011). First, the court must examine the totality of the witness' background to determine whether he or she exhibits any one or more of the qualifications listed in Rule 702—knowledge, skill, experience, training, or education—with respect to a relevant field. *Arista Records LLC*, 2011 WL 1674796, at *2; *523 IP LLC*, 48 F. Supp. 3d at 641–42 (citing cases). Second, the court "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *523 IP LLC*, 48 F. Supp. 3d at 642 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)); *accord Arista Records LLC*, 2011 WL 1674796, at *2; *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 251–52 (S.D.N.Y. 2010). Furthermore, courts in the Second Circuit liberally construe expert-qualification requirements in consideration of the "'thrust' of the Federal Rules and their general relaxation of traditional barriers to opinion testimony." *United States v. Ulbricht*, No. 14-cv-68 (KBF), 2015 WL 413318, at *7 (S.D.N.Y. Feb. 1, 2015); *see also United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985) ("The words 'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of the Rule[.]"); *Arista Records LLC*, 2011 WL 1674796, at *2 (citing cases); *Lidle ex rel. Lidle v. Cirrus Design Corp.*, No. 08 Civ. 1253 (BSJ) (HBP), 2010 WL 2674584, at *3 (S.D.N.Y. July 6, 2010); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 457–59 (S.D.N.Y. 2010) (citing cases). Thus, "[i]f the expert has educational and experiential qualifications in a general field closely

related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Arista Records LLC*, 2011 WL 1674796, at *3 (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)).

Mr. Waldron has "over 25 years of professional experience advising mortgage servicers, subservicers, specialty servicers, and other financial services clients." Waldron Report at 3, Qualifications ¶ 1. Mr. Waldron is a lawyer with experience leading mortgage banking practices and has served as in-house counsel at three mortgage companies, for two of which he was General Counsel and Chief Compliance Officer. *Id.* at 3–4, Qualifications ¶¶ 2–3. His experience includes advising financial services companies and, specifically, mortgage servicers in "developing and modernizing compliance management systems[.]" *Id.* at 4, Qualifications ¶ 5. Considering the standards outlined above and the "liberalizing purpose of the Rule," *Brown*, 776 F.2d at 400, this experience, and the additional experience listed in the Waldron Report and discussed at Mr. Waldron's deposition, makes Mr. Waldron qualified to testify as an expert on the opinions which he reached in his Report.

## 2. The Waldron Report Does Not Impermissibly Rely on Undisclosed Expert Testimony

Next, LoanCare asserts that the Waldron Report impermissibly relies on expert testimony provided by an undisclosed witness, Rick Needles, who assisted Mr. Waldron in conducting the statistical samplings proffered in his report. *See* LoanCare *Daubert* Motion at 9–12. For this proposition, LoanCare relies primarily on *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007), in which the court excluded testimony from an expert about regression analysis "because it is nothing but conduit testimony from an expert on a matter outside his field of expertise[,]" and it was thus "unreliable and [would] not assist the jury." *Id.* at 666. But the

caselaw is clear that "[e]xpert witnesses are entitled to rely on facts, opinions and data developed or prepared by another," *In re M/V MSC Flaminia*, No. 12 Civ. 8892 (KBF), 2017 WL 3208598, at *5 n.6 (S.D.N.Y. July 28, 2017) (citing *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015)); *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 385 (S.D.N.Y. 2014). "[A]n expert may rely on assistants or the opinions of other experts in formulating their own expert opinions," so long as the expert in the end gives his or her own opinion instead of "simply aggregat[ing] or recit[ing] the opinions of others." *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 115 (S.D.N.Y. 2021) (citations omitted). Even the *Malletier* court acknowledged that "experts are permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field." 525 F. Supp. 2d at 664.

Mr. Waldron disclosed that he relied on research performed by his team in reaching the ultimate opinions he offers in the Waldron Report. *See* Waldron Report at 3, Qualifications ¶ 3 ("My opinions are based on my and my team's research, review and analysis of the discovery documents and the materials listed in Appendix A, as well as my professional education, training and experience, which includes but is not limited to my knowledge of the mortgage servicing industry."). Among that team was Mr. Needles, who Mr. Waldron disclosed in his deposition worked "under my direction . . . on the sampling methodology for the three samples that we conducted and the underlying analysis and document level review and is someone who I've worked with previously." Dkt. No. 81-2 ("Waldron Dep") 10:23–11:5. Unlike the expert in *Malletier*, Mr. Waldron has not merely recited Mr. Needles' findings but, rather, has made independent findings and conclusions based on his own analysis of Mr. Needles' samples. *See* Waldron Report at 12–23. To the extent LoanCare believes such reliance on Mr. Needles'

analysis constitutes a defect of Mr. Waldron's conclusions and opinions, such "purported analytical shortcomings go to weight, not admissibility[,]" and may indeed be "proper subjects for cross-examination." *U.S. Bank Nat. Ass'n*, 112 F. Supp. 3d at 131.

### 3. Mr. Waldron's Proffered Opinions Are Relevant

In addition to the requirements of Fed. R. Evid. 702, expert testimony is also subject to the relevancy requirement under Fed. R. Evid. 401. An expert opinion is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see Daubert*, 509 U.S. at 591 ("This condition goes primarily to relevance."). LoanCare contends that Mr. Waldron's testimony is irrelevant to the claims asserted in this case and should therefore be excluded. *See* LoanCare *Daubert* Motion at 12–13. Specifically, LoanCare takes issue with "48 line-items, or 12 percent of the 377 line-items used in [Sample 1]" because LoanCare is not seeking damages with respect to those line-items. *Id*. at 12. This, LoanCare claims, amounts to improper "apples and oranges comparison." *See id*. at 13; *see also Boucher*, 73 F.3d at 21. The Court disagrees. Mr. Waldron's opinions—which, are based entirely on documents produced in discovery in this case (*see* Waldron Report at 3, Introduction ¶¶ 4, 5)— will assist the jury in determining whether the parties adequately performed their respective obligations under the Contract. And, of course, even documents regarding loans for which LoanCare is not seeking damages may be relevant to the parties' course of conduct under the Contract and also, potentially, to Dimont's defenses to the breach claims asserted by LoanCare. The topics of proposed testimony are therefore relevant under the tenets of Fed. R. Evid. 401 and *Daubert*.[10]

---

[10] In an aside, LoanCare also contends that during his deposition "Mr. Waldron was shown various documents he allegedly could not locate that were produced by LoanCare and that directly contradicted his findings," and this makes "his analysis wholly unreliable." LoanCare *Daubert* Motion at 13. Such contradiction does not make the conclusions automatically impermissibly speculative, however,

### 4.  The Waldron Report Contains Impermissible Legal Conclusions

"[T]he use of expert testimony is not permitted if it will 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'"  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (quoting *Bilzerian*, 926 F.2d at 1294)).  By attempting to opine on questions of law, the expert is not considered helpful to the trier of fact because "an expert is . . . barred from giving 'testimony on issues of law.'"  *Navigators Ins. Co. v. Goyard*, 608 F. Supp. 3d 44, 48 (S.D.N.Y. 2022) (quoting *Bilzerian*, 926 F.2d at 1294); *see also Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) ("[C]ourts exclude expert testimony that 'provides legal opinions, legal conclusions, or interprets legal terms; those roles fall solely within the province of the court.'" (quoting *Highland Cap. Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005))).  "The rule prohibiting experts from providing their legal opinions or conclusions is 'so well-established that it is often deemed a basic premise or assumption of the evidence law—a kind of axiomatic principle.'"  *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (quoting Thomas Baker, *The Impropriety of Expert Witness Testimony on the Law*, 40 U. KAN. L. REV. 325, 352 (1992)); *accord Dooley v. United States*, 577 F. Supp. 3d 229, 232–34 (S.D.N.Y. 2021).  The interpretation of a contract is a question of law, as to which expert testimony is not permitted.  *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977).

---

and LoanCare is free to cross-examine Mr. Waldron with such documents at trial to aid the jury in assessing his credibility and the weight that should be afforded to his conclusions.  But the Court will not exclude his opinions on this ground.

Applying these principles, portions of the Waldron Report improperly state legal conclusions.  For example, the Waldron Report contains legal conclusions regarding interpretation of contractual language, including the following:

- "Importantly, 'timely and professional manner' does not mean that Dimont would be liable to LoanCare for every single missed deadline or error in claim filing." Waldron Report at 17, Analysis, Observations and Opinions ¶ 34.

- ". . . Dimont agreed that Dimont would not be liable for 'delivery, processing, quality check, or data handling errors' such as the ones that LoanCare alleges here."  *Id*. ¶ 36.

- "In my opinion, LoanCare did not meet its contractual obligations."  *Id*. at 19, Analysis, Observations and Opinions ¶ 42.

- "The SOW provides that LoanCare shall provide assistance in the form of information and cooperation as may be reasonably required for Dimont to meet its obligations and notes that Dimont may not be able to meet certain timelines and other Service Level Agreements if LoanCare does not promptly respond to Dimont's requests and inquiries."  *Id*.

- "Based on my review, LoanCare did not comply with its obligations to properly structure, carefully conduct, or prudently manage its third-party vendor relationship with Dimont."  *Id.* at 20, Analysis, Observations and Opinions ¶ 47.

This situation is analogous to that in *Marx & Co., Inc. v. Diners' Club Inc.*, where the Second Circuit held that the trial court erred by permitting an expert witness, a lawyer, to opine on the legal obligations of contracting parties in a breach of contract claim.  *See* 550 F.2d at 508–09.  On opposition, Dimont even admits that Mr. Waldron "offers his expert opinion on the use of the phrase 'timely and professional manner' *in the MSA*" but argues it is in service of providing his opinion on "what that phrase means in the context of the mortgage servicing industry."  Dkt. No. 106 at 16 (emphasis added).  Mr. Waldron may be permitted to talk about the expectations and standards of performance in the mortgage servicing industry generally, and apply that knowledge to the facts of this case, but there are limits: "[e]ven if [an expert's] testimony is couched in terms of industry practices, the expert still may not, under any circumstances, opine on the ultimate legal issue in the case."  *Media Sport & Arts s.r.l. v. Kinney*

35

*Shoe Corp.*, No. 95 Civ. 03901 (PKL), 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (citing *Bilzerian*, 926 F.2d at 1295).  The LoanCare *Daubert* Motion is therefore GRANTED with respect to its request to strike the portions of the Waldron Report that state legal conclusions regarding the meaning of the MSA or the obligations it created, specifically paragraphs 33–36, 42, 49, and 50.[11]

### 5.  Mr. Waldron's Opinions Regarding Employee Training Are Permissible

Mr. Waldron's report includes some opinions regarding the adequacy of Dimont's training programs and materials.  *See, e.g.*, Waldron Report at 20, Analysis, Observations and Opinions ¶ 45 ("Based on my review, Dimont had an appropriate training program.").  LoanCare claims Mr. Waldron is unqualified to offer this opinion and requests the Court strike it.  But, as discussed, Mr. Waldron is qualified to opine on the issues he discusses in his Report.  *See supra* § II(A)(1).  By virtue of the closeness of the relationship between loan servicing and employee training in the loan servicing business, this includes his conclusion that Dimont's training program was appropriate.  *Arista Records LLC*, 2011 WL 1674796, at *3 ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.") (quoting *In re Zyprexa*, 489 F. Supp. 2d at 282).  Moreover, during his deposition Mr. Waldron testified that in his role in compliance, he reviewed "all training material" including "documentation" and "training plans, scripts, policies, procedures [and] theories," and that he pulled from his experience representing

---

[11] The LoanCare *Daubert* Motion requested that the Court strike additional paragraphs of the Waldron Report for stating ultimate legal conclusions, specifically paragraphs 33–42, 46–47, 49–50, but upon review, the Court concludes that LoanCare's list is overinclusive and sweeps in statements that do not express a view on the ultimate legal issue in the case.  *See Media Sport & Arts*, 1999 WL 946354, at *3.

"literally hundreds of different platforms" when he set forth his opinion "that Dimont had an appropriate training program."  Waldron Dep. 147:16–148:3.  The Court therefore declines to strike this opinion from the Waldron Report.

* * *

For the foregoing reasons, the LoanCare *Daubert* Motion is GRANTED in part and DENIED in part.

### B.  The Dimont *Daubert* Motion

In the Dimont *Daubert* Motion, Dimont moves for an order precluding Marcel Bryar, LoanCare's expert, from offering any testimony or opinions in this matter.  *See* Dimont *Daubert* Motion at 1–3.  Dimont offers five justifications in support of this request: (1) Mr. Bryar's report contains impermissible narrative summaries and factual background; (2) Mr. Bryar's prior experience is insufficient and inadequate to offer testimony regarding the standards for operating an investor claims business; (3) Mr. Bryar cannot testify to Dimont's purported errors in claims processing because he did not review any underlying documents relating to the claims at issue; (4) Mr. Bryar impermissibly opines as to the Contract's ultimate meaning; and (5) portions of Mr. Bryar's testimony amounts to improper "bolstering" of a LoanCare fact witness, Thomas Brown.  The Court addresses each argument in turn.

### 1.  The Bryar Report's Narrative Background is Permissible

It is commonplace, even standard or expected, for expert reports to contain a section dedicated to a summary of the factual background relevant to the ultimate opinions and conclusions detailed in the report.  Courts in this district have indeed recognized that "[i]t is certainly the case that an expert may and often must rely on facts—and that the expert will state them in a report."  *See Scentsational Techs., LLC v. Pepsi, Inc.,* No. 13 Civ. 8645 (KBF), 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom. Scentsational Techs. LLC v.*

37

*PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019); *see also Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) ("[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation."). A factual or narrative recitation becomes improper, however, when the "statements go beyond recitation of how a document is supportive of an opinion and are instead a characterization of the document for the purposes of having the fact finder accept that interpretation as fact[.]" *Scentsational*, 2018 WL 1889763, at *4. Likewise, an expert may not "opine on a party's state of mind," or opine as to other issues that may "invade the province of the jury." *Id.* (first quoting *Highland Capital Mgmt.*, 551 F. Supp. 2d at 187).

The Bryar Report contains a narrative summary that Dimont contends is impermissible as it is "purely factual narration that . . . simply provides and frames facts of the case." Dimont *Daubert* Motion at 5; *see also* Dkt. No. 96-2 ("Bryar Report"). Dimont takes issue with Mr. Bryar quoting "sources like governmental agency handbooks, relevant contract provisions between the parties, pleadings and the deposition testimony of other witnesses." Dimont *Daubert* Motion at 5. But these are exactly the kinds of facts that must be stated—without reference to their relative credibility—to provide context for the reader of the report. *See Scentsational*, 2018 WL 1889763, at *4. And upon the Court's independent review of the Bryar Report, the Court finds that Mr. Bryar does not impermissibly invade the province of the jury in restating these facts; his narrative section merely provides relevant background for the opinions and conclusions reached in the remainder of the report. Accordingly, the Court declines to strike these portions of the Bryar Report.

### 2. Mr. Bryar is Qualified to Offer Opinions on Investor Claims Processing

Next, Dimont alleges that Mr. Bryar is unqualified to testify because he "lacks the 'superior knowledge, education, experience, or skill' relevant to the subject matter of his

38

opinions." Dimont *Daubert* Motion at 5 (citing *Tin Yat Chin*, 371 F.3d at 40) (internal references omitted). The Court disagrees and finds Mr. Bryar qualified to testify as to the processing of investor claims. Federal Rule of Evidence 702 requires that a proposed expert witness be "qualified as an expert by knowledge, skill, experience, training, or education." *Malletier*, 209 F. Supp. 3d at 636. Mr. Bryar's decades-long career in the federally-backed mortgage industry has provided him with superior knowledge and experience directly relating to investor claims processing, which is the subject matter of his proffered testimony. *See In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 240 (S.D.N.Y. 2018).

Mr. Bryar has worked in the mortgage industry since 2000. Bryar Report ¶ 14. For 14 years, Mr. Bryar worked at Fannie Mae—a government-sponsored enterprise (commonly referred to as a "GSE") that securitizes mortgage loans for secondary market investors—in senior roles relating to the "origination, processing, closing, recordation, servicing, and securitization of mortgage loans," where his roles included working on "contracts for the review, by Fannie Mae, of investor claims filed by servicers of Fannie Mae loans." *Id*. ¶¶ 16–17. While at Fannie Mae, Mr. Bryar also helped implement regulatory agreements with the Office of Federal Housing Enterprise Oversight, assisted with developing procedures to ensure compliance with the Sarbanes-Oxley Act, and oversaw the framework governing all of Fannie Mae's policies and procedures, including those governing risk management, mortgage loan securitization, and master servicing. *Id*. ¶¶ 18–19. In 2007, Mr. Bryar was appointed as the head of Fannie Mae's regulatory team, *id*. ¶ 21, and in 2011, he became responsible for overseeing all of the vendors that worked with servicers of Fannie Mae loans to mitigate losses from loan delinquencies, *id*. ¶ 25. In this role, Mr. Bryar managed numerous loss-mitigation services, including property

preservation, lender-placed insurance, mortgage insurance, and foreclosure notices, and managed

a team that reviewed expenses incurred by servicers in connection with the servicing of Fannie

Mae loans.  *Id.*  After Fannie Mae, Mr. Bryar worked at JPMorgan Chase Bank, N.A. ("Chase")

where he was Senior Vice President in the bank's mortgage-servicing operations division.  *Id.*

¶ 26.  At Chase, among other responsibilities, Mr. Bryar oversaw a large mortgage loan servicing

transfer to Chase, managed the servicing transfer of loans from Chase to other servicers, and

negotiated disputes with the GSEs regarding compensatory fees and investor claims.  *Id.*

These experiences, among the numerous others discussed in the Bryar Report and during

his deposition, make Mr. Bryar qualified under Fed. R. Evid. 702 and the standards of *Daubert*

to opine on issues pertaining to investor claims processing and mortgage operations.  The Court

therefore denies Dimont's request to preclude Mr. Bryar's testimony on the grounds that he is

unqualified to provide his opinion on these matters to a jury.

### 3.  Mr. Bryar's Opinions on Dimont's Work Are Reliable

Dimont next argues that Mr. Bryar's proffered opinions are not based on reliable data and

should thus be excluded.  *See* Dimont *Daubert* Motion at 7.  Specifically, Dimont complains that

Mr. Bryar did not review the underlying investor claims in reaching his opinion on the nature

and cause of Dimont's alleged errors.  *Id.* at 7–9.  But it was unnecessary for Mr. Bryar to review

the underlying claims to reach his relevant conclusion:  namely, the opinion that the documents

in this litigation show that Dimont lacked the skill, training, and experience to process the claims

properly.  *See generally* Bryar Report.  Rather, it is sufficient that Mr. Bryar—who, as discussed,

is qualified to assess and opine on issues of investor claims processing in the mortgage servicing

industry—relied on documents, data, and interviews to understand the methodology used by

LoanCare to determine loss attributable to Dimont's alleged errors in processing the investor

claims, and formed his opinions based on them.  *See* Bryar Report at App'x A; *see also Gussack*

40

*Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect."); *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016) ("Experts need not have actually collected the data on which they base their conclusions in order to be credible." (quoting *Cedar Petrochems. Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011))).  The relative weight to assign such opinions, and their ultimate reliability, is a matter best left to cross-examination and, ultimately, to determination by the jury.

### 4.  Mr. Bryar's Statements Regarding the Contract Are Not Impermissible Legal Conclusions that Must Be Stricken

In the Bryar Report, and again at Mr. Bryar's deposition, he repeatedly states that he does not offer an opinion as to the interpretation of the Contract or its specific provisions.  *See, e.g.*, Bryar Dep. 104:8–15.  Indeed, LoanCare agrees that it is "not an expert's responsibility to interpret the contract."  Dkt. No. 118 at 7 (citing *Stanley v. Direct Energy Servs., LLC*, 466 F. Supp. 3d 415, 430 (S.D.N.Y. 2020) (explaining that the factfinder will be responsible for interpreting the energy contract's ambiguous terms)).  Dimont, however, argues that certain portions of Mr. Bryar's testimony and opinions contained in the Bryar Report constitute impermissible legal opinion and thus should be stricken and precluded.  *See* Dimont *Daubert* Motion at 9–12; *see also* Bryar Report ¶¶ 66, 104, 106, 109.

Upon review of the portions of Mr. Bryar's deposition and expert report that Dimont identifies as problematic, the Court agrees with Dimont that Mr. Bryar's proffered opinions sometimes tread close to being interpretations of the parties' relative obligations under the relevant contracts and, thus implicitly, the meaning of those contracts.  *See, e.g.*, Bryar Dep. 156: 9–12, 168:23–169:12; Bryar Report ¶ 104.  The Court, however, declines to strike any specific paragraph of the Bryar Report because, when read in the context of Mr. Bryar's specific

expertise, the entire substance of the Bryar Report, and in conjunction with Mr. Bryar's repeated statements that he is not opining on the meaning of the contract, there is little to no risk that a reasonable member of the jury would consider these passing phrases to be ultimate legal conclusions that would usurp their responsibility.  If, however, Mr. Bryar attempts to offer any opinions on the interpretation or applicability of any provisions of the Contract during his testimony at trial, the Court will intervene, strike such testimony if necessary, and provide curative instructions to the jury to disregard any such opinions.  *See Duncan*, 42 F.3d at 101 ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.") (emphasis in original); *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992); *Bilzerian*, 926 F.2d at 1294; *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988).

### 5.  Mr. Bryar's Statements Regarding Mr. Brown Are Not Improper

Finally, Dimont argues that certain portions of the Bryar Report constitute inappropriate bolstering of one of LoanCare's other witnesses, Mr. Brown, who is being offered to provide testimony pertaining to LoanCare's loss analysis. [12]  *See* Dimont *Daubert* Motion at 12–13; *see also United States v. Lombardozzi*, 491 F.3d 61, 77 (2d Cir. 2007) ("Expert testimony may not be used to bolster the credibility of fact witnesses.") (citing *United States v. Cruz*, 981 F.2d 659, 662–63 (2d Cir. 1992)).  Specifically, Dimont takes issue with Mr. Bryar's statements that LoanCare's loss analysis (performed by Mr. Brown) was "prepared in accordance with industry

---

[12] In the Dimont Motion *In Limine*, Dimont argues that Mr. Brown's testimony is being offered as lay opinion but is impermissibly offering "both fact and opinion testimony," and should be excluded due to LoanCare's failure to disclose Mr. Brown as an opinion expert pursuant to Fed. R. Civ. P. 26.  *See* Dimont Motion *In Limine* at 3–6.  The Court addresses the merits of that motion *infra* § III.

standards," Bryar Dep. 195:11–18, and that Mr. Brown is generally reliable and "displays an impressive level of knowledge," Bryar Report ¶ 82; Bryar Dep. 187:7–17; 199:16–21.

In support of its position, Dimont relies on *In re Namenda Direct Purchaser Antitrust Litigation*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018) and *Perkins v. Southern New England Telephone Co.*, No. 3:07-CV-967 (JCH), 2011 WL 336715 (D. Conn. Jan. 31, 2011). But those cases are inapplicable to Mr. Bryar's proffered testimony. *In re Namenda Direct Purchaser Antitrust Litigation* instructs that expert testimony that is "little more than expert '*ipse dixit*'" and "adds nothing to the direct evidence that cannot be elicited from fact witnesses," is impermissible and should be excluded. 331 F. Supp. 3d at 171–72. Likewise, the *Perkins* Court held the testimony proffered by the expert witness was "well within the ability of a jury to" understand and thus the risk that such opinions would impermissibly bolster the testimony of fact witnesses outweighed their probative value. 2011 WL 336715, at *4. Thus, in both cases, the issue the relevant court identified was that the portions of the expert testimony that could be interpreted as bolstering fact witness testimony did not contribute any additional understanding to the trier of fact beyond that bolstering. In this case, Dimont cannot (and does not) attempt to argue that the substance of Mr. Bryar's proffered opinion could be elicited from other fact witnesses, *see In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 171, or that the matters on which he opines are within the ability of a normal lay jury member to understand, *see Perkins*, 2011 WL 336715, at *4. Thus, the potential risk that the (limited and passing) statements regarding the reliability of Mr. Brown's conclusions would impermissibly "bolster" Mr. Brown's testimony does not outweigh the probative value of Mr. Bryar's opinions as to the investor claims process and the pertinent loss analysis report. To the extent Mr. Bryar's trial testimony were to stray over the line into impermissible bolstering, or an irrelevant opinion about

the personal characteristics of a fact witness, the Court can address it at that time, using the means described above.  The Court thus declines to strike the identified portions of his report.

* * *

For the reasons discussed above, the Dimont *Daubert* Motion is DENIED.

### C.  The ICS *Daubert* Motion

ICS moves before this Court for an order striking portions of Mr. Bryar's testimony and report "as it pertains to ICS."  *See* ICS *Daubert* Motion at 5.  ICS argues that Mr. Bryar's testimony regarding ICS is impermissibly speculative or conjectural and thus precluded by Federal Rules of Evidence 401, 403, and 702 and *Daubert* and its progeny.  *See id.* at 3–4; *see also Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 284, 289 (S.D.N.Y. 2013) (expert's specialized knowledge must be more than "subjective belief or unsupported speculation").  Given the Court's ruling herein that ICS is not liable as successor to Dimont and thus LoanCare cannot sustain its sole claim against it as a matter of law, *see supra* § I(C), the Motion is DENIED as moot.

## III.  THE DIMONT MOTION *IN LIMINE*

In addition to its *Daubert* motion discussed above, Dimont separately moves for an order precluding certain LoanCare fact witnesses—specifically, Latoya Allen-Davis, Charles Trefry, Thomas Brown, and Stacy Darnell—from offering "opinions" because the Rule 26(a) disclosures were insufficient and/or they were not properly disclosed as experts.  *See generally* Dimont Motion *In Limine*.  As discussed below, the Court finds the motion entirely meritless.

First, Dimont's contentions that LoanCare violated Federal Rule 26(a)(2)(C) by providing insufficient disclosures as to the topics of testimony is unfounded.  As the rule requires, LoanCare provided Dimont with the subject matter of the expected opinion testimony and a summary of the facts and opinions to which each witness was expected to testify, and

Dimont has had the benefit of years of discovery to obtain additional information about the substance of their potential testimony at trial, including in the form of deposition testimony. Moreover, the record demonstrates that this motion is the first time Dimont has objected to the LoanCare's Rule 26(a) disclosures.  Thus, in addition to having a lack of legal foundation to make this motion, Dimont long-ago waived any objection to any alleged deficiencies in the disclosures by failing to raise this issue during discovery.

Second, Dimont's (legally unsupported) assertion that the fact witnesses may not testify as to the MSA's terms because they did not work for LoanCare during its negotiation is either contrary to law or otherwise not ripe for the Court's review.  *See* Dimont Motion *In Limine* at 5–6.  Dimont first argues that the portions of Mr. Brown's declaration that offer his "opinion about the meaning of contractual terms," is impermissible because he had no "involvement in the negotiation and signing of the MSA," and thus cannot testify as "to what Dimont and LoanCare meant by those terms."  *See id.* at 6; *see also* Dkt. No. 83-2 ¶ 34.  That Mr. Brown did not work for LoanCare during the MSA's negotiation is irrelevant, particularly because the parties' post-execution conduct is relevant to the interpretation of ambiguous contracts.  *See, e.g.*, *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 329 (S.D.N.Y. 2019); *Creaven v. Erickson*, No. 19 Civ. 330 (DRH) (SIL), 2022 WL 2643500, at *8 (E.D.N.Y. Mar. 24, 2022), *aff'd in part & vacated in part on other grounds*, 22-874-cv, 2023 WL 4247213 (2d Cir. June 29, 2023); *Evans v. Deposit Cent. Sch. Dist.*, 183 A.D.3d 1081 (3d Dep't 2020); *Ames v. Cnty. of Monroe*, 162 A.D.3d 1724 (4th Dep't 2018); *Myers v. City of Schenectady*, 244 A.D.2d 845 (3d Dep't 1997).  Moreover, the law is clear that it is permissible for Mr. Brown to offer his lay opinion if that opinion is "based on a combination of [his] personal observations of the incident in question and background information [he] acquired through earlier personal observations." *B*

*& G Plastics, Inc. v. Eastern Creative Indus., Inc.,* No. 98 Civ. 0884 (RMB) (JCF), 2004 WL 307276, at *8 (S.D.N.Y. Feb. 18, 2004).  His testimony as to his opinion on what the MSA required him to do in the course of his role at LoanCare is just that sort of lay opinion.  *See also id.* ("The fact that the lay opinion testimony bears on the ultimate issue in the case does not render it inadmissible.").  As to Dimont's additional claims that other LoanCare witnesses apart from Mr. Brown also intend to testify with respect to "the terms and intent of the MSA," *see* Dimont Motion *In Limine* at 5, no such testimony yet exists in the record before the Court and thus any such determination as to its potential admissibility is not ripe for review.

Finally, Dimont's assertion that the testimony of Mr. Brown (and that of other LoanCare fact witnesses) constitutes impermissible expert testimony under Fed. R. Evid. 702 is without merit.  Testimony that "results from a process of reasoning familiar in everyday life," is permissible lay opinion testimony under Rule 701.  *United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (quoting Fed. R. Evid. 701, advisory committee's note to 2000 amend.).  LoanCare's witnesses have firsthand knowledge of the facts of this case and, in addition (and obviously), have developed technical skills and understanding from their jobs working in the loan servicing business; there is no law that precludes them from testifying as to that particular firsthand knowledge.  *See, e.g.*, *B&G Plastics,* 2004 WL 307276, at *8.  And, as noted above, "[i]nsofar as portions of the testimony exceed the scope of what is permissible, the Court will address specific objections on a case-by-case basis, and give an appropriate limiting instruction as to the purpose for which the testimony is being admitted."  *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 335 (S.D.N.Y. 2009).

Accordingly, the Dimont Motion *In Limine* is DENIED.

46

## CONCLUSION

For the reasons stated herein, the LoanCare Motion (Dkt. Nos. 83, 84) is DENIED, the

Dimont Motion (Dkt. No. 100) is GRANTED in part and DENIED in part, the ICS Motion (Dkt.

No. 92) is GRANTED in part and DENIED in part, the LoanCare *Daubert* Motion (Dkt. No. 80)

is GRANTED in part and DENIED in part, the Dimont *Daubert* Motion (Dkt. No. 94) is

DENIED, the ICS *Daubert* Motion (Dkt. No. 90) is DENIED as moot, and the Dimont Motion *In

Limine* (Dkt. No. 97) is DENIED.  The Clerk of Court is respectfully directed to terminate Dkt.

Nos. 80, 83, 84, 90, 92, 94, 97, and 100, and to terminate Defendant ICS from this case.

Dated:  March 28, 2025
        New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge